1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   MIKHIEL JAKOB LEINWEBER,                CASE NO. CV F 07-01429 LJO WMW HC

12                    Petitioner,            **ORDER DENYING PETITION FOR WRIT**
                                             **OF HABEAS CORPUS WITH**
13          vs.                              **PREJUDICE; DIRECTING CLERK OF**
                                             **COURT TO ENTER JUDGMENT FOR**
14   TILTON, et al.,                         **RESPONDENT; DECLINING ISSUANCE**
                                             **OF CERTIFICATE OF APPEALABILITY**
15                    Respondents.

16   _____/

17
            On August 30, 2007, Mikhiel Jakob Leinweber ("Petitioner"), a *pro se* California prisoner, filed
18
     a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254
19
     ("Petition").[1]  On February 4, 2008, Robert Horel ("Respondent") filed an Answer to the Petition.  On
20
     February 26, 2008, Petitioner filed a Traverse.  Thus, this matter is ready for decision.
21
                                **PROCEDURAL HISTORY**
22
            On May 5, 2005, a Stanislaus County Superior Court jury convicted Petitioner of first degree
23
     murder (Cal. Penal Code § 187(a)) and further found that Petitioner personally and intentionally
24
     discharged a firearm causing death (*id.* § 12022.53(d)).  (1 Clerk's Tr. ("CT") 234; 2 CT 423.)  The
25
     superior court found true that Petitioner had two prior serious felony convictions pursuant to California
26

27   _____

28          [1]      Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
     the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

                                                1

1  Penal Code section 667(a), two prior felony convictions pursuant to section 667(d), and one prior prison

2  term pursuant to section 667.5(b).  (1 CT 187; Lodged Doc. ("LD") 4 at 2.)  On August 1, 2005, the

3  superior court sentenced Petitioner to 111 years to life in state prison.  (2 CT 423-24.)

4        On August 1, 2005, Petitioner appealed his conviction and sentence to the California Court of

5  Appeal.  (2 CT 425-27.)  On April 24, 2007, the court of appeal affirmed the murder conviction in a

6  reasoned opinion but remanded with directions to strike the prior prison term enhancement.  (LD 4.)

7  On May 25, 2007, Petitioner filed a petition for review in the California Supreme Court, which

8  summarily denied the petition on July 25, 2007.  (LD 7.)

9        On May 14, 2007, Petitioner filed a habeas petition in the California Supreme Court, which

10  denied the petition on October 24, 2007, with citation to *In re Dexter*, 25 Cal. 3d 921 (1979), *In re*

11  *Swain*, 34 Cal. 2d 300, 304 (1949), and *People v. Duvall*, 9 Cal. 4th 464, 474 (1995).  (LD 8.)  On June

12  1, 2007, Petitioner filed a habeas petition in the California Court of Appeal, which summarily denied

13  the petition on June 7, 2007.  (LD 6.)  On June 26, 2007, Petitioner filed a second habeas petition in the

14  California Supreme Court, which summarily denied the petition on December 19, 2007.[2]

15        On August 30, 2007, Petitioner filed the instant federal Petition.

16                              **FACTUAL BACKGROUND**[3]

17  **Prosecution**

18        On the afternoon of March 26, 2004, in Modesto, Levi Humphres, Michael
    Vickerman, and [Petitioner] were in [Petitioner]'s car with 17-year-old Melissa G. and
    15-year-old Heather Glover. As they drove, Vickerman saw that [Petitioner] had a gun

19  with him. The group ended up in front of Brandy Brown's house.

20        Brown, who had five young children, was outside when [Petitioner] and the
    others pulled up. [Petitioner] and Brown went inside and the two played dice. The people
    in the car smoked methamphetamine. When [Petitioner] sent Brown outside to get his

21  wallet from the car, she told the group that they either had to come inside the house or
    leave. Glover said she wanted to go home. Vickerman took the car to drive Glover home,

22  and the others went inside Brown's house.

        Vickerman drove Glover to where he thought Glover lived, but no one was home.

23  While they were in the car, [Petitioner] called the cell phone he had left in the car and
    said he wanted his car back. Vickerman then drove Glover to her father's house so that

24  she could pick up some clothing before returning to Brown's.

25

26  [2]        The Court takes judicial notice of the state appellate court records for Petitioner's case, which are available
    on the Internet at http://appellatecases.courtinfo.ca.gov.  *See Smith v. Duncan*, 297 F.3d 809, 815 (9th Cir. 2002).

27  [3]        The Court adopts the factual background from the April 24, 2007, California Court of Appeal opinion on
    direct review as a fair and accurate summary of the evidence presented at trial.  *See* 28 U.S.C. § 2254(e)(1); *Hernandez v.*

28  *Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

Brown testified that when [Petitioner] realized, about an hour or so after he arrived, that Vickerman had taken his car, he became "aggravated." He called his cell phone, which he had left in the car, but Vickerman hung up on him and then turned off the cell phone.

While in Brown's house, [Petitioner] was carrying a gun, which one of Brown's children asked to see. Brown overheard [Petitioner] say to Humphres, "I'm gonna kill him."

When Brown heard [Petitioner]'s car finally pull up, she was afraid something was going to happen and went outside to gather her children. Brown went back inside the house, but could see [Petitioner] yelling through the passenger side of the window, past Glover, and pointing at Vickerman in the driver's seat.

After Vickerman pulled up to the curb and turned off the car, [Petitioner] yelled and told the two of them to get out of the car. [Petitioner] was holding a gun in his right hand. Vickerman saw [Petitioner] transfer the gun into his left hand and then open the car door with his right hand. [Petitioner] said, "Get the fuck out of the car," and grabbed Glover, as if to pull her out. Vickerman heard a shot and saw the gun hit the ground. Glover turned toward Vickerman and laid her head down. Vickerman got out of the car and ran away, and, as he did, he saw [Petitioner] pick up the gun and chase him. As [Petitioner] was bent over, trying to run, he dropped the gun and said, "Mike, help me, dawg, help me."

Humphres described [Petitioner] as "pretty mad at [Vickerman]" and thought [Petitioner] and Vickerman would get into a physical fight. Humphres testified that [Petitioner] walked up to the car with the gun in his right hand and said, in a loud voice, "Get out of my car." [Petitioner] shifted the gun into his left hand and opened the door to the car. Humphres turned back toward the house and heard a shot. He did not see the shooting but then saw Glover's body. Humphres and Melissa G. left the scene together.

Russell Shaw, who had been at Brown's house, was pulling away in his car just as Vickerman pulled up. Shaw heard [Petitioner] yell, "Get out of the car," and Vickerman say, "Don't, Bro, don't." Shaw heard a shot, and, in his rearview mirror, he saw [Petitioner] fumbling, as if trying to pick up something. Shaw testified that [Petitioner] was known to carry a .22-caliber pistol with a "wood handle."

Melissa G. was standing behind [Petitioner] as he tried to pull Glover out of the car. She heard a gunshot, after which [Petitioner] looked stunned, dropped the gun, and fumbled for it. Melissa G. thought that [Petitioner] had not meant to shoot Glover because his head went backwards as the gun went off and he had a surprised look on his face. Melissa G. thought both [Petitioner] and Vickerman were tugging on Glover, while Glover was trying to get out of the car. Melissa G. repeated this version of the event to two individuals one or two days after it occurred.

Brown, who was still in the house when she heard two or three shots, ran outside. She saw the car's passenger door open and a girl slumped in the seat. Brown's children told her that [Petitioner] took off running. Brown's 11-year-old son told her that [Petitioner] "just shot that girl." After the shooting, Brown gathered her children and left. She did not attempt to help Glover.

Brown's 11-year-old son testified that [Petitioner] had been carrying a gun in a pouch, which the boy wanted to see. Later, when the boy was outside, he saw [Petitioner] holding the gun and heard two shots. The boy heard the man inside the car say "Mickey, don't shoot." The driver of the car got out and ran away, and [Petitioner], holding the gun, ran after him.

Karen Keating, who knew Shaw, testified that Shaw told her shortly after the incident that [Petitioner] came out of the house with the gun in his hand, said "I'll teach you to take my car, bitch," walked over to the car, and fired a shot into the open door. Shaw also told her [Petitioner] then dropped the gun but picked it up and ran after another man who had been in the car. But Keating also testified that Shaw always maintained that the shooting could have been an accident. And Keating acknowledged that men call each other "bitch" when they are mad.

Keating, who also knew Brown, testified that Brown told her that prior to the shooting, [Petitioner] was highly agitated and paced with a gun in his hand "talking about when that bitch gets back here, ... he was gonna shoot her."

At sunset, a passerby noticed the car parked with both front doors open and a body inside. The police were called and Glover was found seated in the passenger seat but slumped toward the driver's side of the car. She was alive, but had a severe brain injury. A makeup kit containing syringes was found in the car, as were .22-caliber shell cartridges. Brown's house was empty, but the front door was wide open and the lights were on. No gun ever was found.

Glover was examined at the hospital, where she was found to have sustained a "nonsurvival injury" because the bullet had crossed her brain stem. Methamphetamine was found in her system. Glover was declared brain dead two days later.

The medical examiner opined that, based on the soot ring around the wound, the gun had been within one inch of Glover's temple when she was shot. The .22-caliber bullet traveled from the temple through the brain into the left sinus. At the time of the autopsy, Glover's head had been shaved. The examiner indicated that he could have given a more accurate opinion of how close the gun was to Glover's head when it was fired had he seen the wound right after Glover was shot. Because there was no stippling or tattooing, which does not wash off, the examiner knew for certain that the distance of the gun was less than a foot, but that he thought it was closer to an inch.

[Petitioner] surrendered and was arrested in Crescent City on April 7, 2004. A week or so later, while in jail, a fellow inmate, Derik Coronado, heard [Petitioner] say, "Yeah, I shot her in the head" and "She wasn't nothing to me, she was some bitch." Coronado had known [Petitioner] for about three or four years. Coronado repeated the conversation to two deputy sheriffs.

Inmate informants Robert Lopez and Erik Austin testified that they overheard the same conversation. Some of these statements were reported by the inmates to a deputy at the jail, but the term "bitch" was not used. A deputy and another inmate, who also were present at the time the purported statements were made, claimed not to have heard them.

Greg Finley, who had been in a cell with Humphres before and during the trial, testified that Humphres discussed the upcoming case with him. Before he testified, Humphres told Finley that [Petitioner] transferred the gun from one hand to the other and the gun went off accidentally. Later, after he testified, he told Finley that, prior to the shooting, [Petitioner] was "irate" and was going to "kill [Vickerman]" for taking the car.

Lance Laranjo testified to an event that occurred at Clay Henson's house prior to the shooting. Melissa G. and Glover also were present. Melissa G. thought someone had stolen her drugs and called [Petitioner]. When [Petitioner] arrived, he was holding a gun, but it was not pointed at anyone. When Laranjo asked to see the gun, [Petitioner] became threatening.

**Defense**

[Petitioner] testified that he picked up Vickerman and Humphres and the three drove around trying to arrange a trade of some methamphetamine for audio speakers. While they were driving, Melissa G. called for help from Henson's house because her drugs were missing. [Petitioner] drove to Henson's house. It was about 4:30 or 5:00 p.m.

He entered Henson's house with a gun in his hand since he knew there was a methamphetamine lab on the premises and that a gun was kept there. Because Melissa G. told him someone had taken methamphetamine from her purse, he searched Laranjo and his girlfriend, and Humphres searched their truck, looking for the drugs. When Laranjo asked to see the gun, [Petitioner] refused.

Glover arrived at some point and [Petitioner] left in his car with her, Humphres, Vickerman, and Melissa G. He followed Henson to a motel to deliver drugs.

Eventually, [Petitioner], Humphres, Vickerman, Melissa G., and Glover went to Brown's house because it was a safe place to do a drug deal. While there, [Petitioner] played dice with Brown. He kept his gun in a holster. The others stayed in the car and did

4

drugs. He sent Brown out to the car to get his wallet. He assumed everyone in the car had followed Brown back inside.

When [Petitioner] discovered that Vickerman had taken his car to drive Glover home, he called his own cell phone, which he had left in the car, and argued with Vickerman. [Petitioner], who had a drug deal waiting, became irate when Vickerman failed to return with the car and when Vickerman would not answer the cell phone. While he was standing in front of Brown's house waiting for the return of his car, Vickerman and Glover pulled up. [Petitioner] thought only Vickerman would be in the car because Vickerman had borrowed the car to take Glover home.

[Petitioner] pulled out his gun, thinking there was a fight, and he thought Vickerman had a gun as well. But as he approached the passenger side of the car, he could see that Vickerman did not have a gun. [Petitioner] moved the gun to his left hand. When he realized that Glover was still in the car, he yelled at both of them to get out. He tried to pull Glover out of the car.

[Petitioner] then testified, "I came to a ... stop and I lost the grip on the gun in my ... left hand and I tried to catch it with my left hand and pop, the gun went off, and I tried to catch it after it ... went off and I just dropped it. I just dropped the gun." [Petitioner] stated that he was still holding Glover with his right hand when the gun went off. He saw Glover lean to the left and her eyes roll back. Vickerman then said, "No, Mickey. Oh, my God, Mickey."

[Petitioner] had a difficult time picking up and holding onto the gun. He fled the scene because he was scared and on parole. He claimed to have thrown the gun in some ivy and the holster onto a roof. He fled to Oregon until his mother convinced him to turn himself in. He surrendered to officers in Crescent City. He denied he made any comment about the case while in jail. He acknowledged that he knew it was a crime for him to possess a gun because he was a convicted felon.

(LD 4 at 2-7.)

## PETITIONER'S CLAIMS

1.   The prosecutor misstated the law during closing argument, and the trial court erred by failing to correct the prosecutor's misstatement (Pet. 4, 7);[4]

2.   The prosecutor impugned the integrity of defense counsel and implied that defense counsel suborned perjury, committed misconduct by misusing prior bad acts evidence, and engaged in other purported misconduct (*id.* 4, 14-15); and

3.   To the extent that Claims One and/or Two are waived for defense counsel's failure to object, Petitioner alleges ineffective assistance of counsel (*id.* 5).

## STANDARD OF REVIEW

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to

---

[4]     For ease of reference, the Court utilizes the CM/ECF pagination for the Petition.

Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly

6

1  established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S.

2  at 11 (*quoting* 28 U.S.C. § 2254(d)).  Consequently, a state court decision that correctly identified the

3  governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case.

4  *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

5  However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show

6  that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537

7  U.S. at 24-25, 27.  An "unreasonable application" is different from an "erroneous" or "incorrect" one.

8  *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*,

9  537 U.S. at 25.

10  A state court factual determination must be presumed correct unless rebutted by clear and

11  convincing evidence.  28 U.S.C. § 2254(e)(1).  Furthermore, a state court's interpretation of state law,

12  including one announced on direct appeal of the challenged conviction, binds a federal court sitting in

13  habeas corpus.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

14  ## DISCUSSION

15  ### Claim One

16  In his first claim, Petitioner contends he was denied his right to due process when the prosecutor

17  allegedly misstated the law of involuntary manslaughter during closing arguments.  (Pet. 4.)  Petitioner

18  also claims that the trial court erred by not giving a corrective jury instruction to remedy the alleged

19  misstatement.  (*Id.* 7.)[5]  Because the California Supreme Court summarily denied this claim, the Court

20  must "look through" to the last reasoned decision, that of the California Court of Appeal on direct

21  review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).  In denying Petitioner's claim, the court

22  of appeal stated:

23  > [Petitioner] contends his conviction should be reversed because the prosecutor
> misstated the law of involuntary manslaughter during closing and rebuttal argument.

24  > [Petitioner] claims the prosecutor repeatedly misstated the law by informing the jury that
> because [Petitioner] was an ex-felon in possession of a firearm at the time of the

25

---

26  [5]   Respondent argues that these claims are procedurally defaulted.  (Answer 16-17.)  When the claims raised

27  in a habeas petition are easier to resolve on the merits, the interests of judicial economy counsel against deciding the more
complex or uncertain procedural default issues.  *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (*citing
Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)); *see also Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982).  Because

28  such a situation exists here, the Court addresses these claims on the merits.

shooting, he was guilty of a felony dangerous to human life and could not, therefore, be convicted of involuntary manslaughter. [Petitioner] also argues that, if we find the argument waived, his trial counsel was ineffective for failing to object to the misconduct and request admonitions. [Petitioner] also contends that the trial court erred when it refused to give a clarifying instruction to rectify these misstatements. We conclude there was no prejudicial error.

### *The record*

On cross-examination, [Petitioner] acknowledged that he had been convicted of two felonies and that he knew it was a crime for him to possess a gun.

During closing argument, the prosecutor used a PowerPoint presentation and argued that the killing of Glover was neither self-defense nor an accident, but was murder, and he proceeded to explain the elements of the unlawful killing of a human being with malice aforethought. The prosecutor also explained that, if the jury found that the killing was the result of a "cold and rash impulse," the killing would be second degree murder, not first degree murder.

After discussing the issue of transferred intent, the prosecutor stated:

> "[Petitioner] did a lot of ... dangerous things that day. It's up to you to determine what acts he did which bothered you more than others, but I suggested a few things. He carried a loaded pistol with him everywhere. That's a very dangerous act. Okay? There was certainly no need to do that. In fact, he's a felon. He admitted it's a felony for him to even possess a gun, so that was very dangerous."

The prosecutor then explained that the jury had four possible verdicts: "first degree, second degree, voluntary manslaughter and involuntary manslaughter." The prosecutor proceeded to explain the three possible scenarios for finding second degree murder: that [Petitioner] intended to kill, but lacked premeditation; that [Petitioner] intentionally committed a dangerous act with conscious disregard for human life; or that [Petitioner] intentionally fired his gun into the occupied car.

The prosecutor argued that, in order to find the shooting was an accident, the jury would need to find there was "no criminal intent" or "criminal negligence." As argued by the prosecutor:

> "It's absolutely clear that [Petitioner] had all kinds of criminal intent out there.... [¶] [Petitioner] knew that he was a felon in possession, committing a felony, a status crime right there. [Petitioner] was brandishing around a gun. [Petitioner] was making threats to kill somebody. [Petitioner] admitted to you that he went over there to assault [Glover] and ... [Vickerman], to physically get them out of the car. That's a battery. So there's all kinds of criminal intent here that would defeat an accident."

The prosecutor contrasted this situation with that of "some guy [who] could legally have a gun" which goes off accidentally.

The prosecutor then went through the elements of manslaughter, followed by the elements of involuntary manslaughter:

> "Involuntary manslaughter, [defense counsel is] going to argue for involuntary manslaughter. That's the lowest level of crime that you're instructed on here. I highlighted the requirements of this, that during the commission of the unlawful act not amounting to a felony which is dangerous to human life under the circumstances of its commission. So [defense counsel] would argue that he's brandishing a gun and that it just—it accidentally went off during the brandishing so it was an

8

> involuntary manslaughter, when, in fact, he was committing a felony just
> having a gun. Just having a gun, he was a felon in possession the whole
> day."

The prosecutor highlighted the involuntary manslaughter instruction by underlining the statement that the killing was an involuntary manslaughter if it was done during the commission of an unlawful act "not amounting to a felony." But, as argued by the prosecutor, [Petitioner] "was committing a felony just being there," and "[i]t's a violation of Penal Code Section 12021 for a felon to be in possession of a firearm."

Defense counsel did not object to any of the above statements by the prosecutor. Instead, in closing, defense counsel stated:

> "And, yes, [Petitioner has] got prior felony convictions. And the fact that
> he has a prior felony, [the prosecutor] seems to think that somebody
> who's a felon loses all right to commit an involuntary manslaughter.
> That's what he told you. He's committing a felony by having a gun. That
> is not the law. If that was the law, you wouldn't receive the instruction
> that we're going to talk about later and the judge is going to give you."

Defense counsel also stated that in order to find involuntary manslaughter, there must be an unlawful act. Defense counsel explained that an "[u]nlawful act is an act—you do something, not just the felon in possession of a gun. That's not doing a physical act." Defense counsel told the jurors that if [Petitioner] was brandishing a firearm, tripped and fell and "it goes off on a reactionary trigger pull," then it was appropriate to convict [Petitioner] of involuntary manslaughter.

During rebuttal, the prosecutor addressed defense counsel's suggestion that the shooting was an accident and that the jury find involuntary manslaughter, stating "You don't get down to invol[untary manslaughter], as I said to start with, if you go through the proper charging and you review the evidence." The prosecutor then again addressed the issue of [Petitioner] being a felon in possession of a firearm and stated:

> "[Defense counsel] suggests that being a felon in possession is not a
> felony that would kick him out of the involuntary manslaughter. That's
> for you to decide. I mean ... if you were asked to, you could certainly
> convict this man of simple assault. You can convict this man of
> brandishing. You could convict this man of making threats. Yeah, he did
> a lot of crimes that day, but what we're talking about here is murder, and
> he was also committing a felony, as being a felon in possession, when he
> committed the murder, and that kicks him out of the involuntary
> manslaughter...."

At this point, defense counsel objected, stating that the prosecutor had misstated the law. The trial court overruled the objection.

At the end of argument, defense counsel asked that the trial court instruct the jury "that the fact that a person is a felon in possession of a firearm does not preclude a finding—a verdict of involuntary manslaughter." The trial court instructed defense counsel to draft such an instruction "to see what it is exactly that you have in mind," and bring it to court the following day. The trial court expressed uncertainty because [Petitioner] had, on the stand, admitted that he was a felon in possession of a firearm, and "I think that is a correct statement of law, that a felon can't be in possession of a firearm ... but I'm not sure."

The next morning, out of the presence of the jury, the trial court stated that it had received communication from both parties and that it was not going to include the additional instruction on "felon in possession" that defense counsel asked for. It then stated:

9

"When I saw the instructions or when the instructions were in a draft form, I did have a version that included the language about inherently dangerous felony and that was in the [CALJIC No.] 3.30 special instruction, so to speak, that I crafted. [Defense counsel] asked me to take that out and, in fact, specifically referenced [section] 246,[6] so I did that at his request the other day. [¶] I think that [the prosecutor's] reference to felon in possession goes not towards any of the murder counts but instead goes to the lawfulness of the act that supports the involuntary manslaughter that [defense counsel] had argued, [Petitioner] was acting lawfully when there was the discharge. So the felon in possession relates to that, and for purposes of the record, [the prosecutor] had asked the Court a long time ago never to even allow any instructions on involuntary manslaughter in the first place because he, on behalf of the People, took the view that involuntary manslaughter should not be allowed because it was always that [Petitioner] was acting unlawfully. So I think I've collected a number of thoughts on that and I'll give each of you a chance to say what you want to."

Defense counsel argued again that the mere status of being a felon in possession of a gun should not exclude the possibility that [Petitioner] could be convicted of involuntary manslaughter, citing to *People v. Cunningham* (2001) 25 Cal.4th 926 and *People v. Satchell* (1971) 6 Cal.3d 28, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 484. The prosecutor argued that the cases cited by defense counsel

"only stand[ ] for the proposition that misdemeanor conduct can get you to implied malice murder.... [¶] In the case of the Felony Murder rule, the Courts have decided that certain felonies allow a finding of murder ... without the element of malice, and that's one of the theories in this case, of course, for the [section] 246. There's a whole long litany of felonies that do not amount to a felony that is considered inherently dangerous that would allow automatic second-degree murder. None of these cases address the issue that [defense counsel] wanted this Court to address in instructions and so, therefore, he cited no law that supported his argument that was on point at all."

After argument, the trial court stated that it was going to stand by its earlier ruling.
The jury was subsequently instructed, in pertinent part, pursuant to CALJIC No. 8.45 as follows:

"Every person who unlawful[ly] kills a human being without malice aforethought and without an intent to kill and without conscious disregard for human life is guilty of the crime of involuntary manslaughter.... [¶] A killing in conscious disregard for human life occurs when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for human life. [¶] A killing is unlawful within the meaning of this instruction if it occurred: [¶] One, during the commission of an unlawful act not amounting to a felony which is dangerous to human life under the circumstances of its commission; or [¶] Number two, in the commission of an act ordinarily lawful which involves a high

---

[6]   [California Court of Appeal footnote 2:] Section 246 prohibits shooting at an occupied vehicle.

degree of risk of death or great bodily harm without due caution and circumspection. [¶] A violation of ... Section 417(a)(2) is an unlawful act not amounting to a felony. [¶] The commission of an unlawful act without due caution and circumspection would necessarily be an act that was dangerous to human life in its commission...."

The jury was also instructed with CALJIC No. 3.30, which states:

"In the crime of involuntary manslaughter, which is a lesser crime, there is a union of joint operation of act or conduct and criminal negligence in either of the following: [¶] A, the killing occurred during the commission of an unlawful act of brandishing a firearm, ... Section 417a, which is dangerous to human life under the circumstances of its commission. This is a general intent crime. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, one is acting with general criminal intent, even though the person may not know that the act or conduct is unlawful; or [¶] B, the killing occurred in the commission of an act which involves a high degree of risk or great bodily harm without due caution and circumspection. This is known as criminal negligence."

The instruction requested by defense counsel, but refused by the trial court, read:

"The crime of 'ex-felon in possession of a firearm' is not an inherently dangerous felony. Therefore, an ex-felon in possession of a firearm may be convicted of the crime of involuntary manslaughter."

### Prosecutorial misconduct

It is misconduct for the prosecutor to misstate the applicable law, and particularly to attempt to release the prosecution from its obligation to overcome reasonable doubt on all elements. (*People v. Marshall* (1996) 13 Cal.4th 799, 831; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1215.) A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108 [addressing prosecutorial duty of disclosure].) A prosecutor's misconduct, """"that does not render a criminal trial fundamentally unfair"""" violates California law """"only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."""""" (*People v. Farnam* (2002) 28 Cal.4th 107, 167.) The ultimate question is whether it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from such misconduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, defense counsel failed to object to the claimed instances of improper argument during closing, and objected only to the claimed instance of misconduct during rebuttal. [Petitioner] has therefore forfeited his claims on the purported instances of misconduct made during closing for purposes of this appeal. (*People v. Frye* (1998) 18 Cal.4th 894, 970.) [Petitioner] asserts, however, that defense counsel's failure to object constituted ineffective assistance. In any event, we find no prejudicial misconduct.

[Petitioner] claims that the prosecutor repeatedly misstated the law of involuntary manslaughter by arguing that by being a felon in possession of a firearm, he was guilty of a felony dangerous to human life.

The People concede that the mere possession of a firearm by a felon is not an inherently dangerous felony. In the abstract, possession of a firearm by a felon does not

11

necessarily pose a threat to human life. Section 12021, subdivision (a)(1) simply prohibits a person convicted of a felony from having in his or her possession any firearm. Entirely different penal provisions punish concealing, using, and brandishing such a weapon. (See, e.g., §§ 12025, 245, 417.) While the use of a firearm is obviously inherently dangerous to human life, the simple act of carrying the firearm by a felon is not necessarily dangerous.

This conclusion is consistent with our Supreme Court's determination that a felon who owns or possesses a concealable firearm does not commit an inherently-dangerous-to-human-life felony for purposes of the felony-murder rule. (*People v. Satchell*, *supra*, 6 Cal.3d at pp. 40-41; see also *People v. Cunningham*, *supra*, 25 Cal.4th at pp. 1008-1009 [court noted, citing *Satchell*, that being a convicted felon in possession of a firearm was not a felony inherently dangerous to human life].)

We next address the words of the prosecutor to determine if he misstated the law to the jury. The record shows that the prosecutor stated numerous times that [Petitioner] committed a felony by being in possession of the gun. This is an accurate statement. (§ 12021, subd .(a)(1).) [Petitioner] admitted this. But the prosecutor never stated that mere possession of the gun by [Petitioner] was a felony inherently dangerous to life, although his words conveyed an ambiguous message and he "hedged" close to this statement several times.

For instance, the prosecutor argued that many of [Petitioner]'s actions on the day of the shooting were dangerous, including his carrying a loaded pistol with him everywhere. The prosecutor argued, "He admitted it's a felony for him to even possess a gun, so that was very dangerous."

While arguing that [Petitioner] had "all kinds of criminal intent" to "defeat an accident," the prosecutor stated that [Petitioner] "knew that he was a felon in possession, committing a felony, a status crime right there," but he also gave other examples of [Petitioner]'s criminal intent: he brandished a gun, he made threats to kill, he admitted he went over to the car to assault Glover and Vickerman to get them out of the car, and he committed a battery when he did so.

In discussing the elements of involuntary manslaughter, the prosecutor argued that defense counsel would claim the gun accidentally went off while [Petitioner] was brandishing it, when "in fact, [Petitioner] was committing a felony just having a gun. Just having a gun, he was a felon in possession the whole day." The prosecutor then underscored that in order for the killing to be an involuntary manslaughter, it had to be done during the commission of an unlawful act not amounting to a felony, but that [Petitioner] "was committing a felony just being there."

After defense counsel claimed that the prosecutor's argument that [Petitioner] "loses all right to commit an involuntary manslaughter" was "not the law," the prosecutor argued that it was for "you [the jury] to decide" whether [Petitioner]'s possession was "a felony that would kick him out of involuntary manslaughter." As summed up by the prosecutor, "he did a lot of crimes that day, but what we're talking about here is murder, and he was also committing a felony, as being a felon in possession, when he committed the murder, and that kicks him out of the involuntary manslaughter...."

Whether the prosecutor meant that [Petitioner], as a felon in possession of a gun, could not, as a matter of law, be found guilty of involuntary manslaughter, or whether he was attempting to urge the jury to find that the circumstances of the shooting precluded [Petitioner] from being found guilty of involuntary manslaughter, is not entirely clear. For the most part, the prosecutor's remarks, taken in context, urged the jury to find that [Petitioner]'s actions on the day of the shooting showed intent and in no way could be construed as accidental. "At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

In order to prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of statements in an improper or erroneous manner. (*People v. Clair*

(1992) 2 Cal.4th 629, 663.) In conducting this inquiry, "we do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. (*People v. Howard* (1992) 1 Cal.4th 1132, 1192.)

Here, we do not think the prosecutor's remarks caused the jury to misapply the law to [Petitioner]'s detriment. Viewing the prosecutor's comments in the context of the argument as a whole, we conclude that it is not reasonably likely that the jury construed or applied the complained-of remarks in an objectionable manner. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

The trial court instructed correctly on the various theories of first degree premeditated murder, second degree murder, voluntary manslaughter, and involuntary manslaughter. The jury also was instructed, in CALJIC No. 0.50, that any statement by an attorney inconsistent with the trial court's instructions as to the law must be disregarded. "'[W]e presume the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*People v. Seaton* (2001) 26 Cal.4th 598, 646, quoting *People v. Sanchez* (1995) 12 Cal.4th 1, 70.) Consequently, there was no reasonable likelihood any juror would have applied the prosecutor's comments erroneously. (*People v. Frye*, *supra*, 18 Cal.4th at p. 970.)

### Failure to give additional instruction

[Petitioner] claims the trial court erred when it refused to give a defense-crafted clarifying or "pinpoint" instruction. Defense counsel requested the trial court to instruct the jury that the crime of "ex-felon in possession of a firearm" is not an inherently dangerous felony and that an ex-felon in possession of a firearm may be convicted of the crime of involuntary manslaughter. Although the requested instruction states a correct principle of law, we conclude the trial court did not err in refusing to give the instruction to the jury.

"'"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]....'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) Here, the trial court gave the standard instructions on involuntary manslaughter.

We recognize that a defendant has a right on request to a pinpoint instruction on a particular defense theory, so long as it does not highlight specific evidence regarding the defense. (*People v. Earp* (1999) 20 Cal.4th 826, 886.) "But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) A trial court also may refuse to give an instruction if it is confusing. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1275, disapproved on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835.)

In *People v. Satchell*, the court found prejudicial error when the trial court, while instructing on the theory of second degree murder, stated that the crime of possession of a concealable firearm by a felon was a felony inherently dangerous to human life. (*People v. Satchell*, *supra*, 6 Cal.3d at pp. 31-32.) But no such instruction was given here, and [Petitioner] has cited no authority requiring the giving of the requested instruction.

Assuming there was any error by the trial court in rejecting the pinpoint instruction, we will reverse the judgment only if we conclude there is a reasonable probability the error affected the verdict adversely to the defendant. (*People v. Ervin* (2000) 22 Cal.4th 48, 91.) The jury concluded beyond a reasonable doubt that [Petitioner] was guilty of first degree murder and also found that he personally and intentionally shot Glover. These findings necessarily preclude a finding of involuntary manslaughter because involuntary manslaughter requires there be no intent to harm. (See, e.g., *People v. Earp*, *supra*, 20 Cal.4th at p. 886 [by finding true two special

1  circumstance allegations, jury necessarily determined the killing was first degree felony
2  murder and not any lesser form of homicide; failure to give implied malice second degree
   murder and involuntary manslaughter instructions was harmless].) For this reason we
3  conclude that, even assuming the propriety of the pinpoint instruction, any error in
   rejecting it was harmless.

4  (LD 4 at 8-18.)

5       A habeas petition alleging prosecutorial misconduct will be granted only when the misconduct

6  did "so infect the trial with unfairness as to make the resulting conviction a denial of due process."

7  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643

8  (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[T]he touchstone of due process

9  analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

10  prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). A prosecutor's challenged remarks are viewed

11  in the context of the entire trial. *See Greer*, 483 U.S. at 765-66; *see also Donnelly*, 416 U.S. at 639-43.

12       In addition, a prosecutor is permitted to argue reasonable inferences from the evidence. *Duckett*

13  *v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995). "Counsel are given latitude in the presentation of their

14  closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence

15  presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir.

16  1996).

17       Here, the Court agrees with the court of appeal's analysis. Petitioner does not show that the

18  prosecutor misstated the law of involuntary manslaughter to the jury, or that possession of a gun by

19  Petitioner precluded a finding of involuntary manslaughter by the jury.

20       Even assuming the prosecutor's comments to the jury were improper, they did not "so infect[]

21  the trial with unfairness." *Darden*, 477 U.S. at 181; *see also Brecht v. Abrahamson*, 507 U.S. 619, 623

22  (1993) (holding errors are harmless if they do not have a "substantial and injurious effect or influence

23  in determining the jury's verdict"). The trial court instructed the jurors that their decision was to be

24  based only on the evidence produced in court (*see* 1 CT 197), and the jurors were specifically

25  admonished that counsel's statements were not evidence (*see id.* 190). These admonishments and

26  instructions significantly limited any prejudice caused by the prosecutor's remarks. *See Weeks v.*

27  *Angelone*, 528 U.S. 225, 234 (2000) (stating jury is presumed to have followed court's instructions);

28  *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (holding prosecutor's improper comments were

1   isolated moments in a three day trial, and their effect was mitigated by judge's instructions that closing

2   arguments were not evidence, and the strong proof of the defendant's guilt).  In addition, there was

3   extensive evidence to support the jury's finding of first degree murder including Petitioner's brandishing

4   a gun, making threats to kill, admitting he went over to the car to assault Glover and Vickerman to get

5   them out of the car, and committing a battery doing so.

6           Petitioner also contends that the trial court committed error by failing to give a curative

7   instruction in light of the prosecutor's alleged misstatements.  "[N]ot every ambiguity, inconsistency,

8   or deficiency in a jury instruction rises to the level of a due process violation."  *Middleton v. McNeil*,

9   541 U.S. 433, 437 (2004).  Rather, the question is whether "the ailing instruction by itself so infected

10  the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72

11  (1991) (*quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154

12  (1977).  An ambiguous or erroneous instruction is reviewed to determine "whether there is a reasonable

13  likelihood that the jury has applied the challenged instruction in a way" that violated the Constitution.

14  *Estelle*, 502 U.S. at 72.  The instruction must be considered in the context of the trial record and the

15  instructions as a whole.  *Id.*  Where a claim of instructional error involves failure to give an instruction,

16  the petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less

17  likely to be prejudicial than a misstatement of the law."  *Henderson*, 431 U.S. at 155.

18          Here, as discussed, the prosecutor did not commit misconduct, and the trial court therefore was

19  not required to give a curative instruction.  Even assuming prosecutorial misconduct, the jury was given

20  instructions elaborating the law of involuntary manslaughter (*see* 1 CT 208, 213), admonished that

21  statements by counsel did not constitute evidence (*id.* 190), and was instructed to follow the judge's

22  instructions over counsel's statements in case of any conflict (*id.* 189).

23          Accordingly, and for the foregoing reasons, Petitioner's trial was not rendered fundamentally

24  unfair.  *Darden*, 477 U.S. at 181.  The Court finds that the California courts' rejection of Petitioner's

25  claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

26  determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

27                                          **Claim Two**

28          In his second claim, Petitioner asserts that the prosecutor impugned the integrity of defense

15

counsel and implied that defense counsel suborned perjury; committed misconduct by misusing prior bad acts evidence; and engaged in other purported misconduct. (Pet. 4, 14-15.)[7] Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *Ylst*, 501 U.S. at 803-05. In rejecting Petitioner's claim, the court of appeal stated:

> [Petitioner] contends the prosecutor committed misconduct on numerous occasions during the trial, which resulted in an infringement of his federally guaranteed due process rights, his right to assistance of defense counsel, the right to confront witnesses against him, and the right to present a defense. (U.S. Const., 5th, 6th, & 14th Amends.) [Petitioner] acknowledges that he objected to some instances but not others because such objections would have been futile. In the alternative, [Petitioner] argues counsel was ineffective for failing to object. A review of the record reveals no prejudicial misconduct on the part of the prosecutor.
>
> ***Attacks on the integrity of defense counsel***
>
> [Petitioner] cites to various instances where he contends the prosecutor "engaged in a reprehensible effort to persuade the jury through impugning [the] integrity of defense counsel." (Unnecessary capitalization omitted.) The statements [Petitioner] objects to are:
>
> (1) After the prosecutor made a hearsay objection during defense counsel's cross-examination of a witness, which the trial court sustained, the prosecutor added, "[Defense counsel] knows that that's improper."
>
> (2) After the prosecutor elicited from Vickerman that he had told defense counsel, but not the police, that [Petitioner] after the shooting had said "Help me, dawg, help me," the prosecutor asked Vickerman whether he understood that defense counsel "only had a loyalty to try to help [Petitioner], not to try to do anything else?" Defense counsel did not object. Shortly thereafter the trial court sustained a defense objection to the prosecutor's question to Vickerman whether, in light of his statement to defense counsel, his earlier statement to the officer that did not include this information, was a "bald-faced lie." According to [Petitioner], "This set the theme that colored the rest of the trial: that defense counsel['s] ... loyalty to [Petitioner] caused him to suborn perjury and circumvent discovery rules to try to win [Petitioner's] case by any means."
>
> (3) During redirect of Vickerman, the prosecutor asked him if, during his conversation with defense counsel, defense counsel had asked him questions "like he is here in court, like suggesting what might have happened and then you agreeing with him?" Vickerman responded that defense counsel had asked him to tell the truth. [Petitioner] contends the prosecutor obviously knew leading questions on cross-examination were permissible, but he made the comment to continue his "smear campaign" against defense counsel.
>
> (4) The prosecutor asked Vickerman about the existence of any record of what Vickerman had said to defense counsel. Defense counsel then asked that the trial court take judicial notice that the defense was under no obligation to turn over any notes or statements taken of prosecution witnesses. The trial court stated, "So noted." When the prosecutor suggested to Vickerman that it would have been better to have had a record and been able to examine what had been said during his interview with defense counsel, Vickerman stated, "We are examining it right now." The prosecutor responded, "Well, if you're a credible person then we're okay; right?" The trial court then sustained defense

---

[7] The Court addresses the merits of these claims despite Respondent's argument of a procedural bar. (*See* Answer 21); *supra* note 5; *Franklin*, 290 F.3d at 1232; *Batchelor*, 693 F.2d at 864.

counsel's objection that the prosecutor was being argumentative.

(5) During the presentation of the defense, the prosecutor complained that he had received no discovery of witness Randall Walker's statement that [Petitioner] had not made any comment to the jail inmates. Following a sidebar conference, Walker testified that he had spoken to defense counsel three weeks earlier.

(6) During redirect questioning of Melissa G., a defense witness, the trial court twice admonished the prosecutor to stop making reference to what he thought defense counsel was doing wrong. In the first instance, the trial court told the prosecutor–when he complained that defense counsel was asking a leading question–that he need not propose how to ask questions. In the second instance, when the prosecutor again complained that defense counsel was asking a leading question, he stated "Who's testifying here?" to which the trial court responded, "Just state your objection[.]"

(7) According to [Petitioner], the prosecutor used a PowerPoint presentation during closing argument. It included a slide that defined the interviews by defense counsel as "suspicious" as they were not recorded, were not close in time to the shooting, and stated that the witnesses "all came up with the same accident story after talking with [defense counsel]." According to [Petitioner], the prosecutor used the PowerPoint presentation to "further develop[ ] his theme for the jury that the prosecution witnesses had created or changed their stories after speaking with defense counsel."

(8) During closing, the prosecutor argued that defense counsel had acted suspiciously because he had not generated reports or recordings of his interviews, and that defense counsel had interviewed people of "low character who weren't telling the whole story[.]" Defense counsel objected, and the prosecutor explained that he was not saying defense counsel had broken the law, only that the jury should question the authenticity of the witnesses' statements. Defense counsel objected again, and the trial court sustained the objection "to inferences to improper conduct on the part of [defense counsel]." Immediately thereafter, the prosecutor stated that defense counsel had demonstrated his ability to guide witnesses to say what he wanted them to say and that the jury should "extrapolate that back to talking to a witness multiple times, for whatever length of time you want to talk to, without any record of what was said or how it was said. Okay?" Following a renewed objection by defense counsel, an unreported sidebar was held. The prosecutor then listed for the jury the witnesses who had spoken with defense counsel and whose testimony the prosecutor questioned. During closing, defense counsel told the jury he had not told the witnesses what to say.

(9) During rebuttal, [Petitioner] contends the prosecutor disparaged both defense counsel and the defense theory by stating that defense counsel had managed to keep a straight face while arguing in favor of a manslaughter conviction, that he had never heard of a defense counsel who conducted unrecorded interviews, and that defense counsel was not honorable, but unprofessional and unreliable. Defense counsel made various objections, which were overruled.

Following closing argument, the trial court disclosed a request from defense counsel for "an instruction on prosecutorial misconduct," and that the prosecutor had objected to such an instruction, but that the prosecutor did acknowledge that there "might be some instruction that could be offered on the believability of witnesses[.]" The trial court then revealed that a discussion was had in chambers with the attorneys, and that there was "plenty of evidence that there was opportunity that [Petitioner] had to contact people in advance, which was long before anybody met [defense counsel], and so there was ample evidence on that subject, that these were not versions that were created by [defense counsel]." The trial court also indicated that it was including an instruction on defense counsel's concerns "about interview with or without a recording."

Defense counsel then argued that the prosecutor had, in essence, told the jury defense counsel had suborned perjury by telling the witnesses what to say. Although defense counsel had objected to the misconduct before the jury, he "got to a point where I couldn't do much." Defense counsel then asked that the jury be admonished that the prosecutor committed misconduct, and he also moved for a mistrial. The motion for

mistrial was denied. Subsequently, the trial court instructed as follows:

> "That a witness has been interviewed by an attorney or an investigator, with or without recording, must not prejudice you for or against any party. You may consider this for the issue of the credibility of the witness's testimony only. The personal integrity of [defense counsel] who, like [the prosecutor], is an officer of the court, is not in dispute."

The People do not address any of the particular statements highlighted by [Petitioner], but state that "[t]his is a case of the pot calling the kettle black," and list numerous instances where defense counsel used similar tactics in his defense of [Petitioner].

For instance, during closing argument, defense counsel suggests that the prosecutor was saying, "Let's see if we can snooker some jury into making this a murder because [Petitioner's] got prior felony convictions and he runs with a rough crowd and they do bad things. Let's ignore the evidence." Defense counsel told the jury the prosecution "was taking the case they had solved in 11 days and using the next 11 months to distort, manipulate and misrepresent what had occurred." A number of times, defense counsel accused the prosecution of "trying to distort the evidence." Defense counsel told the jury that inmates who face long prison sentences gladly fabricate lies in order to get a deal and "the DA is more than happy to bring in somebody that says I got a confession or I got an admission from a witness or a defendant or whatever." Finally, defense counsel told the jury the prosecutor "knows he's going to get a conviction for involuntary manslaughter. He's going for all this other stuff because he says this is a bad guy and if I can get the jury to convict him not because of what he did but who he is, well, I'll get something more[.]"

Before addressing the statements made by the prosecutor, we first address the issue raised by the People—that somehow defense counsel's actions excused any misconduct on the part of the prosecutor. If a prosecutor's remarks are responsive to defense counsel's arguments and do not go beyond the record, no misconduct can be charged. (*People v. Hill* (1967) 66 Cal.2d 536, 562.) But lapses of behavior by defense counsel do not excuse professional misconduct by a prosecutor. (E.g., *People v. Bain* (1971) 5 Cal.3d 839, 849 ["A prosecutor's misconduct cannot be justified on the ground that defense counsel 'started it' with similar improprieties"].)

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel ." (*People v. Hill* (1998) 17 Cal.4th 800, 832.) It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense, or to imply that counsel is free to deceive the jury, although a prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

[Petitioner] relies on *People v. Bain*, where our Supreme Court found prosecutorial misconduct when the prosecutor asserted that defense counsel assisted the defendant in fabricating a defense, and then attacked counsel's integrity. (*People v. Bain*, *supra*, 5 Cal.3d at pp. 845-846.)

In *Bain*, the defendant, a Black man, was prosecuted for forcible rape. The defendant and the victim were the only witnesses. The victim testified the defendant raped her in a bus station after a bus ride. The defendant testified that he "picked-up" the victim and that the encounter was consensual. (*People v. Bain*, *supra*, 5 Cal.3d at pp. 843-844.) At trial, the prosecutor repeatedly asserted that the defendant and his counsel fabricated the "pick-up" defense, and that he, as a Black man, would not be prosecuting a Black defendant unless he personally believed the man to be guilty. The prosecutor also attacked the integrity of the defense attorney, and he repeatedly referred to racial matters. (*Id.* at p. 845.) Defense counsel objected to the statements about a fabricated defense and the prosecution's expression of personal belief in the defendant's guilt, but did not object to the attack on his integrity or the racial comments. (*Ibid.*) When the prosecutor repeated

18

the accusation of fabrication in closing, the trial judge did not reprimand the prosecutor, but instead told the jury that defense counsel had "acted properly" and was not "drumming up any stories." (*Ibid.*) In rebuttal, the prosecutor reiterated his personal belief that the defendant was guilty of the crime charged. The prosecutor also referred to defense counsel as the "Golden Boy," and vilified the public defender's office several times.

The *Bain* court held it to be prejudicial misconduct "in the circumstances" of that particular case. (*People v. Bain, supra,* 5 Cal.3d at p. 849.) As explained by the *Bain* court,

> "In most sex offense cases the alleged perpetrator of the crime and the alleged victim are the sole or principal witnesses, and as in the instant case, there is a sharp conflict between their testimony. In these circumstances, there is grave danger that misconduct of counsel may tip the scales of justice. In the circumstances of the instant case, there is a reasonable probability that absent the prosecutor's misconduct objected to by the defense the jury might have reached a different result. [¶] The combination of the two elements of such misconduct—the unsupported assertion that the defendant and his counsel fabricated the 'pick-up' story and the statements of personal belief in defendant's guilt, built on a racial foundation—may well have swayed the jury in what was otherwise a close case." (*Ibid.*)

While several of the comments made by the prosecutor here could be labeled misconduct, we do not think that the statements deprived [Petitioner] of a fair trial nor caused a miscarriage of justice.

First, the trial court admonished the jury not to take into consideration whether the interview of a witness had been recorded. This instruction was in direct response to a number of the statements [Petitioner] now objects to. It is presumed that jurors understood and followed instructions, and [Petitioner] has not established otherwise. (*People v. Delgado* (1993) 5 Cal.4th 312, 331; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Second, while there were statements that implied that defense counsel coaxed the witnesses to change their story to help [Petitioner], there are other statements, which, when read in context, do not so much claim that defense counsel fabricated a story, but rather that the witnesses, who were friends of [Petitioner]'s and afraid of him, did so after he contacted them. The prosecutor's bases for asserting defense counsel "lied" were alleged discrepancies between various witnesses' statements right after the shooting and at trial. Whether such discrepancies existed could be determined by the jury. Because the factual basis for the prosecutor's disparaging comments could be evaluated by the jury, the comments do not carry the risk of an unfair trial as much as the kind of "unsupported implication" by the prosecutor that defense counsel fabricated a defense present in *People v. Bain, supra,* 5 Cal.3d at page 847.

Finally, the case here, unlike that in *Bain,* was not close. The evidence against [Petitioner] was strong. Numerous witnesses, including [Petitioner], testified that, prior to the shooting, he was upset, angry, and had a gun in hand. He was reported to have made several comments to the effect that he was either going to kill Vickerman or Glover. Most of the witnesses to the shooting expected "something" was going to happen when Vickerman returned with [Petitioner]'s car. The medical evidence showed that Glover was shot at very close range. On such a record only egregious error at trial could be deemed prejudicial.

We conclude that any arguable prosecutorial misconduct did not prejudice [Petitioner]'s case, and any misconduct on the part of the prosecutor does not require reversal of the judgment of conviction.

///

19

### *Improper use of evidence*

In arguing for admission of evidence that [Petitioner] had been at Henson's house prior to the shooting, the prosecutor stated that he would use this evidence to prove absence of mistake or accident, [Petitioner]'s state of mind, and the reckless handling of the gun that later killed Glover. Defense counsel opposed the admission, stating there was nothing to indicate a common scheme or plan, and the identity of the shooter was not at issue. The trial court admitted the evidence to show an absence of mistake as "it appears that that may be part of the defense in this case...."

[Petitioner] now contends that the prosecutor committed misconduct through "purposeful misuse" of Evidence Code section 1101, subdivision (b)[8] evidence. The challenged evidence includes the following:

(1) During the cross-examination of Melissa G., the prosecutor asked whether she had seen [Petitioner] with a gun before. She stated that she had. The trial court overruled defense counsel's objections on grounds of "relevance," "352," and "collateral." The trial court stated it thought the issue went to "accident issues." The prosecutor then asked if Melissa G. had seen [Petitioner] shoot a gun before, but she claimed she had not. Defense counsel made another objection on grounds of "402" and, outside the presence of the jury, the trial court stated that it thought the questioning was appropriate "because of the defense of accidental discharge." The prosecutor argued the evidence was relevant to show bias toward [Petitioner], in that Melissa G. was lying to help [Petitioner]. Defense counsel objected, stating the evidence was collateral and an attempt to get character evidence in through the back door. The prosecutor added that he wanted to use the evidence to prove that the shooting was not an accident, but intentional. The trial court allowed the evidence, and Melissa G. later testified that she had seen [Petitioner] shoot a gun before.

(2) During cross-examination, the prosecutor asked [Petitioner] about a statement he supposedly made to police about scaring people. Defense counsel objected and the trial court asked the prosecutor to "move on from that particular question" and that the issue would be taken up during recess. The prosecutor then asked [Petitioner] "who makes the rules" in a 12-man jail cell. Defense counsel objected, but the prosecutor stated that he wanted to show "what kind of person this is." Outside the presence of the jury, defense counsel argued that the prosecutor was trying to bring in improper character evidence. The prosecutor argued that, since intimidation was a "big issue" in the case, he wanted to show "what kind of person he is." After some research, the trial court determined that the statements made were not offered for the purpose of establishing conduct on a specific occasion, and it would allow questioning [Petitioner] about "three comments that are related to the issue of potential intimidation of witnesses." Two statements subsequently were read to the jury during cross-examination of [Petitioner]—one where [Petitioner] stated to an officer that the officer "should take some lessons from me ... on pumping fear into people," and one where [Petitioner] stated "I make up my own rules when I'm in [jail]."

(3) During closing argument, the prosecutor referred to [Petitioner]'s "callous nature" and his intimidation of witnesses.

We fail to follow [Petitioner]'s argument. [Petitioner] makes no assertion that the trial court erred in admitting the challenged evidence, only that the prosecutor committed

---

8        California Evidence Code section 1101(b) provides:

Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

Cal. Evid. Code § 1101(b) (1996).

misconduct by "openly and repeatedly" using the evidence to show "what a bad person [Petitioner] was." We do not agree. In any event, the trial court specifically instructed the jury that:

> "Evidence has been introduced for the purpose of showing that the defendant committed acts similar to those constituting a crime other than that for which he is on trial. This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent, which is a necessary element of the crime charged, or the absence of mistake or accident by the defendant."

Again, we presume the jurors understood and followed the instructions, and [Petitioner] has not shown otherwise. (*People v. Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.)

### Additional acts of prosecutorial misconduct

[Petitioner] contends that, in addition to the prosecutorial misconduct discussed above, "there were a host of other errors" by the prosecutor, especially during examination of the witnesses. According to [Petitioner], the prosecutor committed misconduct by being offensive not only to defense counsel, but to his own witnesses, by repeatedly asking improper questions despite successful objections by defense counsel, and by vouching for witnesses.

[Petitioner] presents a litany of instances in which he claims the prosecutor committed misconduct. They are: six instances where the trial court sustained defense counsel's objections after the prosecutor asked a witness to speculate; 11 instances where the trial court sustained defense counsel's objections to the prosecutor being argumentative; an instance where, after the trial court ruled that [Petitioner] could be impeached with one nonviolent prior felony and a sanitized violent prior felony, the prosecutor elicited from [Petitioner] that he had three prior felonies; one instance where the trial court sustained defense counsel's objection to the prosecutor "testifying rather than asking a question"; one instance where the trial court asked the prosecutor not to engage in dialogue with [Petitioner] during cross-examination; one instance where the trial court sustained defense counsel's objections to the prosecutor asking [Petitioner] why people were afraid of him; one instance when the trial court sustained a defense objection to improper rebuttal; and one instance where the prosecutor brought a photograph of Glover into court before defense counsel had a chance to object to its admission.

Each of [Petitioner]'s allegations of misconduct has been waived for purposes of appeal as [Petitioner] did not object to any of them on that ground. Defense counsel did not object, on any possible grounds, to numerous instances about which [Petitioner] now complains. Even assuming the objections that were made were sufficient to raise a misconduct claim, there was no request that the jury be admonished. Since an admonition could have cured any harm, the matter has not been preserved. (*People v. Cooper* (1991) 53 Cal.3d 771, 822; *People v. Simon* (1989) 208 Cal.App.3d 841, 849.)

In any event, we do not think there was any misconduct. While the prosecutor should have refrained from asking argumentative questions or questions that asked the witness to speculate, we are satisfied that, under any standard of prejudice, those questions did not affect the outcome of the trial. The trial court sustained the defense objections on these grounds, and a party is generally not prejudiced by a question to which an objection has been sustained. (*People v. Mayfield* (1997) 14 Cal.4th 668, 755; *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236.)

[Petitioner] also lists four instances where we fail to see misconduct. They are: the prosecutor tried to intimidate Humphres (Humphres' actual words were that the prosecutor tried to "kind of" intimidate him when he first got to his office); Vickerman stating during testimony that the prosecutor was trying to confuse him by the way he

questioned him; (Vickerman stated "you keep asking different questions to mix me up and I'm not trying to get mixed up here"); The trial court had to tell the prosecutor once to stop asking Vickerman to repeat his testimony (when Vickerman asked, in response to a question, if he was to repeat the whole thing again, the trial court stated, "No, no, not the whole thing again, so get your question in mind, [prosecutor] )"; And, in another instance, Vickerman asked, when referring to the prosecutor, "Can this guy get out of my face?" (the trial court noted the prosecutor was trying, apparently vigorously, to refresh Vickerman's responses, but had then moved back and "that's appropriate").

We also reject [Petitioner]'s contention that the prosecutor committed misconduct by "vouching" for several witnesses. [Petitioner] points to testimony where the prosecutor "elicited" from an officer that he believed the inmate informants. And, during closing, the prosecutor himself vouched for Greg Finley, because he stated Finley's story "rings true."

In the first instance, the record shows that the prosecutor, in questioning the officer who spoke with the inmate informants, asked whether "there [was] anything about you not believing what they were telling you?" The officer responded, stating, "Well, I mean, I'll be honest with you, I was suspicious. I had to—that's my job is to figure out what the truth is and—but by the time I interviewed every one of them in that cell, I believed them." This was not the personal opinion of the prosecutor, but of a witness.

As to the second instance, during closing, the prosecutor argued that it was clear "to anybody that was awake that ... Humphres was lying in trial, but what wasn't clear was what he saw. Okay? It wasn't clear what he saw until you heard that out of ... Finley's mouth, and it rings true. It has the ring of truth to it, even though you didn't hear that from other people, and we're going to talk about that."

The instances complained of by [Petitioner] were not improper vouching on the part of the prosecutor. A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence *outside the record*. (*People v. Sully* (1991) 53 Cal.3d 1195, 1235; *People v. Anderson* (1990) 52 Cal.3d 453, 479.) But, as long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," those comments cannot be characterized as improper vouching. (*People v. Medina* (1995) 11 Cal.4th 694, 757.)

**Cumulative error**

Finally, [Petitioner] argues that the cumulative impact of the prosecutor's "pervasive" misconduct deprived him of a fair trial. We disagree. We have either rejected [Petitioner]'s claims of error or found any errors, assumed or not, not to be prejudicial on an individual basis. Viewing the errors as a whole, we conclude that the errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

(LD 4 at 18-30.)

The Court agrees with the court of appeal's thorough and reasoned analysis. Even assuming misconduct on the part of the prosecutor, Petitioner fails to show the prosecutor "so infected the trial with unfairness," *Darden*, 477 U.S. at 181, or that the prosecutor's actions had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623. In addition, the harmless error analysis from Claim One, *supra*, applies: extensive evidence supported Petitioner's first degree murder conviction, and the jury was admonished that counsel's statements were not evidence.

1    Accordingly, the Court finds that the California courts' rejection of Petitioner's prosecutorial

2    misconduct claims was neither contrary to, nor an unreasonable application of, clearly established federal

3    law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this

4    claim.

5                                      **Claim Three**

6    In his third and final claim, Petitioner states that he received ineffective assistance of counsel to

7    the extent that Claims One and Two, *supra*, are waived.  (Pet. 5, 36-37.)  Because the California

8    Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned

9    decision, that of the California Court of Appeal on direct review.  *See Ylst*, 501 U.S. at 803-05.

10   Although the court of appeal did not directly deny Petitioner's ineffective assistance claims, it indirectly

11   did so by denying Petitioner's prosecutorial misconduct claims, of which the ineffective assistance

12   claims on defense counsel's failure to object are premised upon.

13   For a petitioner to prevail on an ineffective assistance of counsel claim, he must show: (1) that

14   counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance.

15   *Strickland*, 466 U.S. at 687.  A court evaluating an ineffective assistance of counsel claim does not need

16   to address both components of the test if the petitioner cannot sufficiently prove one of them.  *Id.* at 697;

17   *Thomas v. Borg*, 159 F.3d 1147, 1151-52 (9th Cir. 1998).

18   To prove deficient performance, a petitioner must show that counsel's representation fell below

19   an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88.  Because of the difficulty in

20   evaluating counsel's performance, there is a "strong presumption that counsel's conduct falls within the

21   wide range of reasonable professional assistance."  *Id.* at 689.  Only if counsel's acts or omissions,

22   examined in light of all the surrounding circumstances, fell outside this "wide range" of professionally

23   competent assistance will the petitioner prove deficient performance.  *Id.* at 690; *United States v.*

24   *Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  The petitioner must overcome the presumption

25   that, under the circumstances, the challenged action "might be considered sound trial strategy."

26   *Strickland*, 466 U.S. at 689.

27   Establishing counsel's deficient performance does not warrant setting aside the judgment if the

28   error had no effect on the judgment.  *Id.* at 691; *Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998).  A

1   petitioner must show prejudice such that there is a reasonable probability that, but for counsel's

2   unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 694. Thus, the

3   petitioner will only prevail if he can prove that counsel's errors resulted in a "proceeding [that] was

4   fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

5        Here, defense counsel's failure to object to any alleged instances of prosecutorial misconduct did

6   not constitute deficient performance because, as discussed in Claims One and Two, *supra*, the prosecutor

7   did not commit any misconduct. Even assuming prosecutorial misconduct, a reasonable attorney, upon

8   hearing an improper remark by the prosecutor, may elect not to highlight the harmful statement by

9   objecting to it. *See United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) (finding competent

10  counsel may decide to "refrain from objecting during closing argument to all but the most egregious

11  misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign

12  of desperation or hyper-technicality"); *see also United States v. Necoechea*, 986 F.2d 1273, 1281 (9th

13  Cir. 1993) (stating that the failure to object during closing argument is generally within the range of

14  permissible professional legal conduct). Instead, counsel may reasonably choose to rely on the standard

15  jury instruction that counsel's statements are not evidence.

16       Based on the foregoing, Petitioner has failed to show trial counsel's performance was deficient.

17  *Strickland*, 466 U.S. at 687-88. Moreover, even if trial counsel's performance was deficient, Petitioner

18  has failed to show the result of the trial would have been any different. *Id.* Accordingly, the Court finds

19  that the California courts' rejection of Petitioner's ineffective assistance of trial counsel claim was

20  neither contrary to, nor an unreasonable application of, clearly established federal law as determined by

21  the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

22                             **Certificate of Appealability**

23       An applicant seeking to appeal a district court's dismissal of a habeas petition under 28 U.S.C.

24  § 2254 must first obtain a certificate of appealability ("COA") from a district judge or circuit judge. 28

25  U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A judge should either grant the COA or state reasons

26  why it should not issue, and the COA request should be decided by a district court in the first instance.

27  Fed. R. App. P. 22(b)(1); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

28       The applicant for a COA must make a "substantial showing of the denial of a constitutional

right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  A "substantial showing" is defined as a demonstration (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the issues differently; or (3) that issues are adequate to deserve encouragement to proceed further.  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for substituting the word "constitutional" for the word "federal," § 2253 codified the pre-AEDPA standard announced in *Barefoot v. Estelle*).

Where, as present here, a district court has rejected constitutional claims on their merits, the COA standard is straightforward.  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484.  The Court has reviewed the record of this case and finds that reasonable jurists would not find the Court's assessment of the constitutional claims debatable or wrong.  On the merits of this case, reasonable jurists would not debate the constitutionality of Petitioner's conviction and sentence.  Accordingly, the Court declines to issue a certificate of appealability.

## CONCLUSION AND ORDER

For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with prejudice and DECLINES the issuance of a certificate of appealability.  The Clerk of Court is ORDERED to enter Judgment for Respondent and to close Case No. CV F 07-01429 LJO WMW HC.

IT IS SO ORDERED.

Dated:    **February 19, 2009**                    **/s/ Lawrence J. O'Neill**
                                                  UNITED STATES DISTRICT JUDGE